DUFFEY, J., concurring.
I concur in the result only. The plaintiffs' preliminary injunction motion is denied because neither the record in this case, nor the law of the land, support that the plaintiffs are likely to succeed on the merits of their racial gerrymandering claim. I agree with this conclusion. It is the majority's reasoning and account of the record with which I do not agree. The plaintiffs' weak circumstantial case does not support the relief plaintiffs request, and certainly does not support the unnecessary and overreaching statement that the plaintiffs' case is "compelling."
A judicial opinion, especially one that addresses issues on an interim motion, should present to the parties, and the public generally, objectively-stated facts and the decisions reached. In an opinion on a preliminary injunction motion, a court's responsibility is to state the facts and whether they support preliminary injunctive relief. It should not speculate on what the facts may ultimately show. Because the majority opinion departs from these core principles of opinion writing, I do not join in it.
The majority opinion concludes with the following statement:
Ms. Wright and her colleagues openly undertook to help Republican incumbents. In doing so, the 2015 redistricting moved many black voters from districts where their votes would have made an impact into districts where they did not. Do voters know the people they elect can and do shed their own voters to improve their ability to be reelected? It is said that "[t]he object of districting is to establish fair and effective representation for all citizens." Vieth v. Jubelirer, 541 U.S. 267, 307, 124 S.Ct. 1769, 1793 [158 L.Ed.2d 546] (2004) (Kennedy, J., concurring in judgment) (quotation omitted). But fair and effective representation is decidedly not what the voters removed from House Districts 105 and 111 got. Even so, our application of Supreme Court precedent to the record before us leaves us to conclude that plaintiffs are not entitled to the preliminary injunction they seek.
Maj. Op. at 1369. This part of the majority opinion is just one example of the editorial-like *1370 statements made about this State's redistricting and election processes. Although the only claim left in this case is one for racial gerrymandering, the majority opinion nonetheless sees fit to comment on partisan gerrymandering in the redistricting process-a claim this Court previously dismissed and which plaintiffs chose not to replead even though they were given the opportunity to do so.[1] Doc. 28 at 32-35. In an ongoing election, the results of which will not be known until November, the majority announces that the voters of House Districts 105 and 111 were deprived of "fair and effective representation." Maj. Op. at 1369. These comments are not necessary to the finding that the plaintiffs are not entitled to the preliminary injunction that they seek.
I decline to join the majority opinion for other reasons. The first is that the majority opinion, in some cases rather directly, and in other cases by innuendo , impugns the veracity of state employee witnesses who testified in depositions under oath. It is in my view inappropriate, at this stage of the case and on the record here, to malign a witness by suggesting they have offered false testimony when they have not had the opportunity to testify in-person at a hearing. This is especially true when the majority states the testimony by the state and defense witnesses offered must be tested for credibility at a hearing. Maj. Op. at 1366-67. A party seeking a preliminary injunction has the option to present evidence at a hearing on their motion. Neither the plaintiffs nor the defendant chose to call these individuals, and the majority did not request that they testify. As a result, I chose to watch hours of videotaped depositions, including those of Gina Wright, the primary map drawer of House Districts 105 and 111, and Dan O'Connor, an individual whose emails are widely cited by the majority to present its characterization of the record. Ms. Wright's and Mr. O'Connor's live testimony, and at least that of Dr. Chen's, the plaintiffs' expert upon whom the majority heavily relies, likely would have provided the majority the much-needed credibility information missing from this action. Having personally watched the videotaped testimony, I decline to engage in the veracity characterizations embedded in the majority opinion.
My second reason for declining to join the majority opinion relates to the manner in which the record is cited. While I endorse concise writing, the majority opinion fails to provide critical facts necessary to explain the ultimate conclusion reached on plaintiffs' preliminary injunction motion. I believe it is important to fully present all of the facts-good and bad-in reaching a fact-based decision of the kind made here. This is for the benefit of the parties and those who read the opinion now and in the future, so they can fully understand why the record does not support the relief requested by the plaintiffs.
The brevity of the majority opinion fails to adequately accommodate for the very long record in this case, and it does not provide enough factual support to show the shortcomings of the plaintiffs' case.
*1371 For example, the majority opinion states: "These Districts were redrawn in 2015, when the racial makeup of the area was changing. State employees charged with reapportionment brought to light the 'changing demographics'[2] in Henry and Gwinnett Counties." Maj. Op. at 1359. In making this sweeping generalization, the majority opinion fails to acknowledge that Representative Randy Nix, chair of the House Reapportionment Committee from 2013 to 2016, testified that he made the decision to proceed with the redistricting after he received "several" requests from members during the 2014 legislative session for "minor changes to their [ ] districts." Nix Dep., Doc. 124 at 62:6-25, 65:1-66:5.[3] Rep. Nix stated that these individuals provided a number of reasons for the "minor changes," including wanting to move a boundary to encompass family members or recently purchased land or reunite previously-split precincts. Id. at 62:21-65:17. "[I]mprov[ing] political performance" was also a primary concern when drawing the maps. Id. at 151:2-20.
The majority opinion later implicates Ms. Wright in what the majority casts as a "group effort," a sort of cabal, to collectively violate the rights of black voters. The majority conjures up a group sitting in a room clicking on Maptitude to move black voters from one district to another with the intent to depress black voting strength. This image is manufactured from disparate and incomplete representations of the record, and is admittedly made without the information necessary to determine if the testimony on which it is based is credible. For example, a more complete reading of Ms. Wright's deposition testimony tells a different story about the maps she drew, what she sought to accomplish in drawing them and the "demographics" she considered. She testified:
Q: Sure. In the course of the whole process of making changes to District 105, did anybody reference the changing demographics within Gwinnett County?
A: Yes.
Q: Do you recall who referenced the changing demographics of Gwinnett County?
A: Most likely me.
Q: And what is your understanding about the changing demographics in Gwinnett County?
*1372 A: Well, you can look at political data. You can look at a lot of other data that shows from different election cycles that some of the areas in the county that used to vote Republican are now voting Democratic. You can see that moving across, even if you look at the most recent election data throughout the country, so that's an indicator that there's change going, you know, going on throughout the county definitely in that respect.
Q: And do you look at race data as well?
A: I do.
Wright Dep. at 24:8-25:6. This exchange provides additional context for Ms. Wright's use of the word "demographics" and that race is but one element to consider. It is clear that she did not intend or understand the term to relate only to racial statistics, despite the majority's suggestion to the contrary.
In the end, the Court has a responsibility to those for whom a judicial opinion is written. It must provide sufficient information from the record to allow readers to fully comprehend why the facts and law support a particular result. The end result here is indisputably correct. A more complete and objective presentation of the facts, however, would have better shown why the denial of a preliminary injunction was required in this case and why there is still a need to carefully and fully consider the evidence in this case to determine what it does and does not show. That process should be transparent and open to the public.

The issue of partisan gerrymandering is presented in two cases currently before the Supreme Court-one where the Democrats allegedly engaged in partisan gerrymandering and the other where Republicans are accused of it. An opinion in these cases is expected in the next few weeks. See Benisek v. Lamone, 266 F.Supp.3d 799 (D. Md. 2017), cert. granted , --- U.S. ----, 138 S.Ct. 543, 199 L.Ed.2d 422, 86 U.S.L.W. 3292 (2017) ; Gill v. Whitford, 218 F.Supp.3d 837 (W.D. Wis. 2016), cert. granted , --- U.S. ----, 137 S.Ct. 2268, 198 L.Ed.2d 698, 85 U.S.L.W. 3587 (2017).

The term "demographic" does not single out any particular characteristic. Merriam-Webster Dictionary defines "demographic" to mean "the statistical characteristics of human populations (such as age or income) used especially to identify markets." See https://www.merriam-webster.com/dictionary/demographic. The use of the phrase "changing demographics" is a typical rhetorical device. In this case it is used to suggest a single demographic characteristic.

Q: Did anyone else come to you in 2014 raising any-raising the idea of making any changes to their districts?
A: There were several people that came. I can't tell you specific names, but there were a number of people who came and said, you know, I'd like to do this or this. The impact of the previous redistricting had set in, and some had [ ] family members that had been taken out of their district. There was-all of them were relatively minor.... But those were the basic questions that were coming up with and saying we would like to do that....
Q: Do you recall what parts of the state or what areas folks might have been asking about?
A: There were several in the south Georgia area. I remember that. There was some in the Hall County area. There was some in the metro, the northern metro area. I remember these specifically. I can't give you the names, but they were all over the state in terms of the people that had asked for changes.